## WALKER *v.* MANHATTAN BANK.

*(Circuit Court, W. D. Tennessee.* October 1, 1885.)

1. BAILMENT BY AGENT—BANK—SPECIAL DEPOSIT—APPROPRIATION OF THE FUND TO A DEBT DUE THE BANK.

Where a bank receives securities upon a special deposit from an agent charged with the management of the fund, it cannot, without express authority from the principal, or that which may be necessarily implied from the particular facts concerning the agency, apply the proceeds to a debt due to itself from a third person. The authority will not be implied because the agent had control for the purposes of investment, and the principal had consented to other investments from the funds in the hands of the agent in loans to that third person, who was a son of the principal.

2. SAME—REDELIVERY TO THE AGENT—LIABILITY OF THE BANK FOR SUBSEQUENT BREACH OF TRUST BY THE AGENT—KNOWLEDGE OF THE BANK.

But where the bank redelivered a part of the securities on special deposit to the agent, and he subsequently pledged them to another bank for a loan to the firm of which the principal's son was a member, it is not liable for their value to the principal, unless it had notice of a revocation of the agent's authority, or unless it had not only a knowledge of the fact that the agent was about to make that use of the fund, but also of the fact that such use was without authority by the principal, and a breach of his trust.

3. SAME—EFFECT OF DEPOSIT RECEIPT.

Where the agent, having for a time a special deposit in his own name as agent, asked the bank for a receipt showing that fact, which he or the bank sent to the principal without any knowledge by the bank that the principal intended to revoke the agency, and where the principal continued to deal with the agent in relation to the fund, and did not at all communicate with the bank for a long time after the receipt was given, this does not amount to a change of the contract of bailment from one with the agent to one with the principal.

In Equity.

This was a bill to charge the defendant bank as a trustee, and for a breach of trust concerning a special deposit. The court preceded the opinion with the following statement of facts:

The firm of Walker, Sons. & Co., composed of the plaintiff's husband, his brother, and G. H. Judah, was a large mercantile house in Memphis that disastrously failed and made an assignment. The plaintiff and the wife of the other brother, being creditors of the firm for large amounts due them for loans to the firm, owned the book accounts, which were bought for their use by Judah in the name of Maas, the book-keeper, at the assignee's sale, the husband of plaintiff paying for her share. These books, with the knowledge and consent of plaintiff and her husband, who afterwards died,—but it seems without any specific instructions of any kind,—were left with Judah to collect the debts and manage the fund for the two beneficiaries, who resided in other cities. His control over the funds was of the most plenary character. He married a sister of the two brothers, and had been the most active member of the firm, and was best acquainted with its business. The collections were deposited with the defendant bank in his name as "guardian," or in the name of Maas, the former book-keeper of the firm, who became the book-keeper and assistant cashier of the defendant bank. Prior to November 27, 1880, Judah had purchased certain securities with the funds, which he kept on special deposit with the bank or in the name of Maas. On that day he came to the bank and asked Maas for a receipt showing the special deposit, to send to the plaintiff. The bank was not in the habit of giving receipts or certificates for these special deposits, but kept them noted by numbers in a book used for that pur-

pose. Maas wrote a receipt on a sheet of the bank's letter-paper, and, according to his and Judah's testimony, placed it in one of the bank's envelopes addressed to the plaintiff, and put it with the bank's mail. The plaintiff and her daughter swear that it was accompanied by a letter from Maas. What was in the letter does not appear, and, not being preserved, it has not been produced, but is supposed to have been burned as useless. The routine of the bank was that Goldsmith, the cashier, personally signed and inspected every letter and himself enveloped and addressed them. This letter he did not see or sign, and it was never copied into the letter-press. The receipt was as follows:

"MANHATTAN BANK OF MEMPHIS.

"L. LEVY, President.                     E. GOLDSMITH, Cashier.
"L. HANAUER, Vice-president.             M. MAAS, Ass't Cashier.

"MEMPHIS, TENN., November 27, 1880.

"G. H. Judah, Esq., agent for Mrs. Eliza Walker, of Philadelphia, has placed with us on special deposit:

"$3,000, Memph. & Charl. R. R. 2d Mtg. Bonds.
"$2,200, Miss. Central      "        "        "
"$1,100, People's Insurance Co. Stock.
"$5,000, Note E. G., and collateral attached, $6,000 M. Bank Stock.
"$325, Interest notes, (4 @ $81.25.)

"MAURICE MAAS, Asst. Cashier."

Sometime in 1880, the son of the plaintiff, and a son of the other Walker, both young men, commenced business at Memphis as Walker, Sons & Co. This firm kept an account with the defendant bank, and later with the Bank of Commerce. It was "never very strong" financially, and its business was cotton factorage. Judah was thought by Goldsmith to be a partner, and the plaintiff at one time swore he was a silent partner, but afterwards stated she was informed he was not. He says he was only a salaried manager. The members of the firm were inexperienced, and Judah was, in fact, the almost sole manager of all its affairs,—the master spirit of the concern. It is not shown that the young men took any part, except one of them kept the books after Maas had opened them.

The plaintiff in October, 1880, lent to her son, the firm being also responsible, $10,000, as his capital in the concern, derived from the life insurance of her husband. Judah also appropriated, or lent to the firm from time to time, sums amounting to over $9,000 from his collections in behalf of plaintiff on the old books. The interest on these sums and on the special deposit funds were remitted by the firm—not always promptly—to the plaintiff at Philadelphia, by exchange or checks; and sometimes the coupons were sent by express to her. When remittances were delayed she wrote or telegraphed the firm. She never communicated with the bank in any way. The remittances were nearly always in letters by her son, and they contained apologies and explanations for delays.

The defendant bank made large advances to the firm, generally by discounts on the security of the firm's "country paper" due from its customers. Judah promised the bank to always protect it, as far as in his power, and the relation was very confidential. The bank began to urge him for a reduction of the account, and, not being willing to accommodate him fully, he opened an account with the Bank of Commerce. The Goldsmith note maturing November 1, 1881, he notified Judah that he should not longer need the loan. Maas and Judah say that "a few days" before the note matured, Judah, being unable to continue the loan to Goldsmith, determined to lend the money to Walker, Sons & Co.; and to accomplish that purpose the note of Goldsmith was discounted by the bank, and the proceeds placed to the credit of Walker,

Sons & Co. As a fact, this discount was as early as July 5th, for there is in the bank's account no discount of that amount, or anything like it, later than that date and prior to December 30th. Possibly, the note was taken as absolute payment without going into the discount account, as there was on October 22d a payment of $6,000, and a discount of $1,500, which Maas says accompanied the Goldsmith note transaction; but I do not see that this is very material, for there is no doubt Judah was being pressed by the bank for money, and that the Goldsmith note was so used.

At the same time Judah urged a loan on the other securities of plaintiff on special deposit, but the bank declined this on the ground that cotton factors' accounts were not desirable to a bank with so small a capital. The securities were above par and abundantly safe for the loan, and it is one of the facts left unexplained by this testimony why the bank would be willing to appropriate the Goldsmith note and refuse to appropriate the other securities. The explanation given that cotton factors' accounts were not desirable is not satisfactory when the money would have gone still further to reduce the indebtedness. It could not have been a fear of the transaction because of plaintiff's rights in the premises, for the Goldsmith note was taken and the liability to pay back would have been as well risked in one case as the other: the larger amount making no difference, since the money itself would be on hand to pay back, and at least it was no worse off with the whole than a part. I think it a fair inference that the fact was that Judah was unwilling then to appropriate the whole fund to liquidate the old indebtedness of Walker, Sons & Co., and wanted cash in hand for the remaining securities, which the bank was unwilling to give. He used the collaterals released by the Goldsmith payment to secure a loan through a relative of the other young Walker in New York,—that is, I infer this from the circumstances detailed in proof in the Arkansas law suit over those collaterals,—and was evidently hard pressed and not willing then to sacrifice everything to pay the defendant bank, and it was unwilling to let him have any more money. I call attention to this, because I think it explains the transaction, and shows that the bank was not then shrinking from a guilty knowledge that Judah was about to commit a breach of trust, or that while it was willing to make a little breach, it was not willing to make a big one. The proceeds being in its own hands to meet any demand of the plaintiff in that behalf, there was no sense in refusing to lend the money on that account. The bank did not make the loan because Judah was unwilling to pay the money on the old account. He could get the money at the Bank of Commerce. He told the officers of the defendant bank so, and they delivered the securities to him, fully knowing that he was going to make that use of them. Maas consulted the president and the attorney whether he should deliver the securities to Judah, and they directed him to do so. He had forgotten, however, giving him the receipt and sending it to plaintiff, and neither the president nor the attorney knew that fact. Goldsmith, the regular cashier, was absent in New York, but he never knew that fact. Maas never mentioned it, because he says he deemed it unimportant at the time, and forgot it afterwards. The securities were pledged to the Bank of Commerce, except the People's Insurance stock, which was on the books in plaintiff's name and could not be used by Judah. They were sold by that bank to satisfy the loan, and are lost to plaintiff.

The firm of Walker, Sons & Co. soon after failed disastrously, owing defendant bank a balance of over $5,000, notwithstanding Judah, according to his promise, appropriated to the debt certain stocks of his own, and his diamonds. After the failure, Kramer, a son-in-law of plaintiff and a lawyer, came to Memphis and presented the receipt, and then the plaintiff learned, for the first time, that the securities had been so used by Judah and the bank. Kramer secured the delivery to himself of certain "country paper" and mortgages to secure notes that were then first taken for the $20,000 lent by

plaintiff to the firm, not including, however, the securities in controversy here. An angry lawsuit grew out of this transaction, in this family, in the courts of Arkansas. A New York gentleman, nephew of the other young Walker, filed a bill stating that the securities belonged to him to secure his guaranty of a loan by the Traders' & Importers' Bank of New York to the firm for some $26,000, and that he had sent them to the firm for collection, and that they were, by the plaintiff's son, and without consent of the other Walker or Judah, turned over to his own mother; all of which was denied, and the averment made that this scheme was trumped up to defeat plaintiff of her advantage, and enable Judah to continue business on the assets at Indian Bay, Arkansas. These facts are stated to show the course of dealing in this family with each other, relied on to strengthen Judah's authority over the particular funds in controversy in this suit.

*L. & E. Lehman* and *Metcalf & Walker*, for plaintiff.

*T. B. Turley*, for defendant.

HAMMOND, J. As counsel for the plaintiff well remarks, so far as the $5,000 collected by the defendant bank on the Goldsmith note are concerned, this is not a question of negligence, but one of title. The bank knew that the plaintiff was the owner of that fund, and while it may be conceded that, under the circumstances of the deposit, it could safely have redelivered the note and its collateral security to Judah, or might safely have paid him the money without gross or other negligence, it did neither of these things. By authority of Judah, the plaintiff's agent, it converted the fund to its own use by paying the debt of another to itself. This was so significant an act of its own and of the agent that, knowing the plaintiff's title, the bank should have required specific authority from the plaintiff to justify that use of her funds by her agent and itself, and it could not be at all implied from the relation of Judah to the plaintiff and this fund. It was in no sense an investment, as Judah pretends it was; and the bank knew it was not. None knew the weak condition of Walker, Sons & Co. better than the bank, and this was a desperate effort to save a part of its advances to that firm upon inadequate security, and nothing but a deliberate attempt by Maas, the acting cashier, and Judah, two intimate friends, to carry out the confidential arrangement, that Judah would, at all hazards, protect the bank, and which he afterwards further attempted to do by a pledge and appropriation of his individual securities, including even his personal diamonds.

But had the firm of Walker, Sons & Co. been never so solvent, it would have been none the less a conversion by the bank. It is no answer to this to say that Judah had full control of the fund; that he had created it, so to speak; that he had used it with the same full power that he had used his own funds and dealt with it in all respects as if he were its owner. As a matter of fact he was not its owner, and the bank knew full well precisely who the owner was, where she resided, and that a letter or telegram would speedily develop whether or not her agent was authorized to use her money to pay the bank a debt due from a firm in such failing circumstances that the bank was no longer willing to trust it, no longer desired its account, and was

unwilling to lend it money upon securities purchased by it for this agent and known to be ample security for the loan asked. Implied authority will not do to support such a transaction as that, where the principal is known, and the bank, relying on the implication, receives the benefit for *itself*. The temptation to indulge in weak implications for one's own benefit is natural; but where the truth can be so readily learned no implication should prevail to sustain so plain a breach of trust as this was on the part of a special depositary. I am inclined to think that, apart from the relation of depositary, if Judah had come to this bank, it being an entire stranger to all these transactions, and pledged to it the Goldsmith note to secure or pay the Walker, Sons & Co. debt, first relating to the officers all the facts exactly as we have them in this case, and submitting to them the risk of deciding whether he was sufficiently authorized to make the pledge, the plaintiff could recover; because the want of authority would be apparent from the facts. The question is not to be tested by Judah's opinion of his authority as a derivative fact, nor of the bank's opinion of that authority as a derivative fact; but, would any reasonable mind conclude from the circumstances that Judah was authorized to do this particular thing? If he had presented a written power of attorney authorizing him to do all he claims to have had the power to do, and he had construed it to authorize this act, it would have been a fatal misconstruction. He was to invest the fund and make it earn interest for her benefit; he *had* invested this particular fund in a safe security, and it was earning interest; he took the security and pledged it for the debt of another than the owner, taking no security in return, not even the note of that other, with no stipulation as to time of the loan, none as to the rate of interest or time when due, and without a single element of investment in the transaction. Changing the investment would have been an entirely different transaction, and the very necessity that was upon him to convert this fund and the other securities on deposit with the bank was fully known to it, and precludes all idea of any belief that this use of the Goldsmith note was a *bona fide* investment for her benefit. It was the simple conversion of the fund to another's use. Now, it is true that other was the plaintiff's son, who was one of the firm,——and this was a kind of family firm,——but the plaintiff was not a member of it, and was in no way liable to make good its debts to this bank. It is true, she had lent the firm some $20,000 of her other funds; that about one-half of this loan was derived from the same source as the fund in controversy here; and that as to that half she had never given any special directions or authority to lend it to the firm, and it was so lent upon Judah's own responsibility as her agent. It is also true that she seems to have made no complaint of that conduct, but it is equally true that she was fully advised of the investments on special deposit in the defendant bank; that, for some reason, Judah desired a receipt showing the deposit; that it was sent to her, and she set

store by it, and that the firm promised to send on the bonds and place them in her own custody.    As long as they sent her the coupons, or otherwise remitted the interest, however tardily, she permitted the special deposit to remain with her agent.    But it does not follow from all this that she was willing to lend this firm any more money and to turn over this special deposit for their benefit.    The implications were rather to the contrary, and especially if she were as fully aware of the firm's weakness as was this bank, and the bank cannot presume upon her ignorance.    Besides, the bank knew that Judah was the agent of the firm,—the cashier thought he was a member of it, as did almost every one, though he denies this,—its master and manager. This should have made the bank more careful in drawing inferences of authority for its own benefit.    Its title can be no better than Judah's.    It was in no sense an innocent purchaser of the note without notice of the plaintiff's title.    Its right depends wholly on Judah's actual authority to so apply the proceeds, and not on any protection through his appearance of authority.    Knowing the rightful owner, it could derive no title except from that owner directly, or through a duly-authorized agent to transfer it, and Judah was not in fact such an agent.

Altogether, I have not the least doubt that the bank is liable for the amount of the Goldsmith note, and interest from the date of its collection, not so much because of any gross negligence, as because it has collected her money and has never paid it to her, and without due authority appropriated it to its own use by paying the debt due to it from another.    I do not think any dishonesty is to be imputed to the bank in the transaction.    It is difficult to resist the conviction, on the facts of this case, that point to something behind what has been really disclosed, that this family were trying to build on the remnants of the assets of the old family firm that had been withheld from creditors of that firm a new business; that everything was risked for their mutual benefit, and that the plaintiff is trying to retrieve her losses from bad management, and to save from the wreck by setting up technical rights, rather than moral obligations, to herself.    Maas, the acting cashier, was familiar and intimately connected with all this, and relied, perhaps, too much on the fidelity of the family to each other.    Still, the contract of bailment is one of strict right, and the defense has not been projected on the line suggested, of showing that in fact this family conspired together to conceal from the creditors of the old and new firms that which, it may be, rightfully belonged to them, if the full facts were known, by putting the family moneys into such technical shape that if business prospered the men could use the funds, but if disaster came the women could claim them as their own.    There was a suggestion of such defense in the argument, and I doubt not it satisfies the consciences of both Judah and Maas; but the court can decide only according to the technical attitude in which the parties have placed the defense, and not on that which is

left to mere inference, however strong that may be. "For misappropriation of the thing bailed to him, even the bailee without reward makes himself strictly answerable. His attempts to sell, pledge, or give away the thing, or otherwise assume to act as the owner thereof, would be downright dishonesty, and amount to conversion. It is an argument for the good sense and fidelity of parties thus intrusted that our reports shed but little light on these points." Schouler, Bailm. 62; Story, Bailm. § 102, last clause; and see *Duncan* v. *Jaudon*, 15 Wall. 165; *Alexander* v. *Alderson*, 7 Baxt. 403.

I am not so entirely clear as to the bonds converted through a pledge of them to the Bank of Commerce, but I think the defendant bank can only be held for that conversion on the principle that a gratuitous bailee of an agent or trustee becomes the guarantor of that agent's good faith in his subsequent dealings with the property, and that, if this gratuitous bailee has knowledge of the fact that the agent contemplates the pledge of the securities for a particular purpose, he may withhold a redelivery to his own bailor, unless he has a care that the purpose falls within the scope of the bailor's own agency. Aside from the receipt, to be directly considered, there can be no doubt that Judah was the bailor, and the bank's obligation as bailee was *to him*. The fact that he was an agent, and that the bailee knew the principal and all about the agency, does not alter its relations to the bailor. It was not and did not, by the bailment, become a joint trustee or agent with Judah. Judah was its *cestui que trust*, so far as it was a trustee for any one. Accountability to him for the bailment was the full measure of its duty, and it might, without the least imputation of negligence, redeliver to him from whom it received the property. Any other rule than this would deprive all agents of a safe deposit for the property belonging to the agency; for no bank or other depositary could at all afford to become the insurer of the fidelity of every agent who made special deposits with it. No case that has been cited holds such a doctrine. The bailee cannot profit by becoming a joint breaker of the trust; and what we have already said about the Goldsmith note illustrates the stringency of that rule. But does the mere knowledge of the fact that one who is agent contemplates a certain use of the funds constitute the bailee a joint participant in a breach of trust, if by that act one occurs? Should a bailee from the agent, having that knowledge, meddle in the affair, and withhold the property which he has promised to redeliver to that agent? How far must this scrutiny go, and on what kind of evidence should the bailee act in withholding the property? And does he act at the peril of liability both to the agent and the principal for a wrong decision? Furthermore, if he must so act because he has that knowledge, when he is without actual knowledge of any contemplated use, why should he not be put to the obligation of making inquiry? These questions indicate that if the principle be correct, it virtually converts every depositary into a plenary trustee and transfers the agency at once to

the bailee.   The bailee is, indisputably, in a narrow sense, a trustee for the agent's principal, but more largely for the agent himself; and as to neither is he a trustee in other than the limited sense that every custodian is a trustee, though we are apt to press this notion that he is a trustee beyond its proper scope.   Mr. Pomeroy has wisely called attention to the danger of doing this in all cases of *implied* trusts. 2 Pom. Eq. § 1044, and notes.   We have only to read Mr. Justice STORY's commentary on the point to see how far the doctrine contended for here goes beyond anything he conceived in relation to it. The original doctrine that this bank could only have delivered to Judah, the agent, and not at all to his principal, has been broken down, indeed, and now the delivery may be always to the true owner; but he does not hint at the doctrine that there can be no delivery to the agent who made the deposit without some special authority of the principal.   Story, Bailm. §§ 102–108; *The Idaho*, 93 U. S. 575, 579.

If a trustee be bailor, it is only when the trust ceases that the bailee must deliver to the rightful *cestui que trust*.   Story, Bailm. § 109. He must also regard any other revocation of authority that comes to his notice; but I find no case that holds a bailee when he delivers to his immediate bailor without some notice of the revocation of the bailor's own agency.   Schouler, Bailm. 69.   None of the cases cited by counsel, either as adjudications or in principle, can be held to charge the bank here further than the Goldsmith note.   I shall not extend this opinion by a review of them to show this, but leave that to the critical examination of the reader.   *Duncan* v. *Jaudon*, *supra;* *First Nat. Bank* v. *Graham*, 100 U. S. 699; S. C. 79 Pa. St. 106; *Smith* v. *Ayer*, 101 U. S. 320; *National Bank* v. *Insurance Co.*, 104 U. S. 54; *Colyar* v. *Taylor*, 1 Cold. 372; *Alexander* v. *Alderson*, *supra;* *Treadwell* v. *McKeon*, 7 Baxt. 203; *Parker* v. *Gilliam*, 10 Yerg. 394; *United Society of Shakers* v. *Underwood*, 11 Bush, 265; S. C. 13 Amer. Law Reg. 211, and note; *Shaw* v. *Spencer*, 100 Mass. 389; *Loring* v. *Brodie*, 134 Mass. 453; *Bundy* v. *Monticello*, 84 Ind. 119. And see *Mechanics' Bank* v. *Bank of Columbia*, 5 Wheat. 326, 337; *Scott* v. *National Bank*, 72 Pa. St. 471; *Chattahoochee Bank* v. *Schley*, 58 Ga. 369; *Smith* v. *National Bank*, 99 Mass. 605; *Foster* v. *Essex Bank*, 17 Mass. 479; *Whitney* v. *National Bank*, 55 Vt. 154.   These cases fully recognize the doctrine that any one, whether a bailee or a third person, who joins with a trustee in a breach of trust for his own profit, or purchases with notice of the true owner's rights, is liable to that owner; but they go no further than this, and do not establish that mere knowledge that the agent is about to pledge the securities to another for a particular purpose, without profit of its own in the transaction, is a basis for such liability; and the claim here must depend entirely upon the right of this bank to redeliver these securities to Judah, who placed them on deposit.   To paraphrase the language of *Turton* v. *Dufief*, 6 Wall. 420, we are asked to hold that the bank, which did the plaintiff's agent the kindness to keep safely for him the

securities she had placed in his hands for management, should have anticipated his breach of trust, and intervened to prevent it by denying his right to retake a possession which the bank had taken from him. A bailee without hire, as by a special deposit, is unquestionably in some degree less bound to look after the conduct of a fiduciary bailor than a banker having a general deposit for a like trustee. The circumstances under which a liability like that claimed here will arise against the latter are stated in *Gray* v. *Johnston*, L. R. 3 H. L. 1, and attention is there called to an important element in the consideration of such cases, which is: that a banker cannot question the right of his customer by refusing to honor his demands by check or otherwise, upon any theory that it is the banker's duty to look after the appropriation of the trust funds when withdrawn from the bank, and to protect the trust by setting up a *jus tertii* against the demand. This case goes further than any I have found, in some of its expressions, to justify the contention that mere knowledge of the banker that a breach of trust is intended makes him privy to it and liable. But, on scrutinizing the cases there cited, it will be found that participation in the profits of the fraud is, generally speaking, an element in the case; and a "mere reason to believe that the trustees were misapplying the assets" will not make the banker liable; for "this would be to make every trustee accountable for his conduct in the trust to every agent whom he happened to employ, and would carry the principle of constructive trust to an inconvenient and, indeed, to an impracticable length." *Keane* v. *Robarts*, 4 Madd. 356. And in this case itself it is said:

"Supposing, therefore, that the banker becomes incidentally aware that the customer, being in a fiduciary or representative capacity, meditates a breach of trust, and draws a check for that purpose, the banker, not being interested in the transaction, has no right to refuse payment of the check; for if he did so, he would be making himself a party to an inquiry as between his customer and third persons. He would be setting up a supposed *jus tertii* as a reason why he should not perform his own distinct obligation to his customer." *Gray* v. *Johnston, supra,* 14.

These reasons apply with a greater force to a mere special deposit. *Trefftz* v. *Canelli*, 4 P. C. 277; *Giblin* v. *McMullen*, 2 P. C. 317; *Davies* v. *Sadler*, 19 Ch. Div. 86.

At all events the bailee must know that the contemplated appropriation is a breach of trust, not merely that a certain transaction is about to be consummated, which may or may not be a breach of trust, according to circumstances unknown to him. This is clearly established by the cases. Now, how did this bank know that Judah did not have authority from the plaintiff to lend this money to her son's firm, as he had lent other money to that firm out of this same fund? I have held that this would not serve as a defense where the bank got the benefit, as in the matter of the Goldsmith note, because there it was a question of title, and the right depended on the actual fact of authority, express or implied. But on this point it works the

other way, and it is a question of negligence or guilty knowledge of Judah's want of authority; not whether the authority existed in fact, but whether the bank knew it did not exist. The bank did not know when it redelivered the securities to the same custody from which it obtained them what we now know, after careful examination of witnesses and critical scrutiny into the force and effect of admitted circumstances, that Judah had no express authority, and as a matter of law none could be fairly implied from his previous dealings with the firm. How could the bank say Judah had no authority when it had no right to make an inquiry into it? He did, presumptively, have authority, and the bank might assume that so full an agent as he was or had been was acting within the scope of his authority, just as one may assume that an executor is in the discharge of his office, and not acting beyond it. The negligence was on the part of the plaintiff. She swears she did not trust Judah, and had no confidence in him, while all the time before she had trusted him, in fact, by leaving this large fund in his entire control. She made no reply to the letter she got from the bank,—if she received it from that source,—from November 27, 1880, to the date of Kramer's visit in December, 1882. She did not write to terminate Judah's agency, and gave no directions not to redeliver to him, nor did she take any significant act in that direction; but, on the contrary, always communicated by letter and telegram about the interest with her son's firm, or with Judah, which was about the same thing, as this record shows that he was the real manager of the firm business.

Unless, then, there is something in the receipt given by the bank, or in the circumstances attending it, to change the relation of Judah to the fund and to the bank, she cannot recover. I think the effect of that receipt has been greatly exaggerated, and that the use of it made by the plaintiff is an afterthought. It is in form a receipt to Judah, and not to the plaintiff. Nothing was further from Judah's intention than by that act to terminate his control over the securities. The bank had no such intention. The plaintiff had not by word or line indicated any intention to do that thing, *so far, at least, as the bank knew,* and *that* is the point of our inquiry. She never communicated with the bank, and always with others, about the interest, and this for more than a year before their delivery to Judah. The circumstance of Judah coming into the bank and asking for a receipt to be sent to her, and having the bank inclose it to her, was entirely consistent with his continued agency. I think it altogether probable, as the letter is not produced, that Maas merely inclosed it at Judah's direction in the envelope of the bank, and without any letter unless from Judah, or at the most only with his own note to that effect; for it did not go through the regular routine of being signed by Goldsmith, the cashier, and copied on the letter-press book, as would have been done if it had been the formal transaction of the bank. I think the plaintiff did not by these circumstances become the bank's bailor to

the exclusion of Judah, and, naturally, the bank continued to recognize Judah's agency, as it had done for a long time before; and, as between her and the bank, there is no reason for imposing the loss by her own neglect on the bank. She trusted Judah and not the bank; or if she relied on the bank to protect her, she failed in any way to notify it of that fact. The receipt does not promise that the bank shall deliver to its holder, or contain any words to that effect, as some have done in the cases examined. It was not usual to give certificates of special deposit in this bank, and this is hardly a certificate at all, and contains none of the *indicia* of negotiable or assignable deposit receipts intended to be used to secure or transfer title. It does not say that Mrs. Walker has deposited the securities through or by her agent, but that "G. H. Judah, Esq., agent for Mrs. Eliza Walker, of Philadelphia, has placed with us on special deposit," etc. The coupons of the bonds were payable in New York, and, altogether, if Mrs. Walker wished to discharge Judah, naturally she would have taken these securities into her own custody. Why should she keep them at Memphis? Plainly, they had been always under Judah's control, as the funds were from which they were derived, and the idea of treating this receipt as a change in his attitude towards the fund, and a change of the bank's attitude towards it, is resorted to in the hope of throwing the loss by her own neglect on the bank.

There is no satisfactory proof that the bank got $1,000 of the proceeds of the bonds. It may have done so, but it is not certain. The check on the Bank of Commerce, paid to defendant bank, was paid February 14, 1882. The discount on the pledge of the securities was on the 21st, and we know that a part of the bonds were, in fact, in New York until the 24th. Judah was largely overchecked with the Bank of Commerce when the discount was made, and the identical money realized by the discount may or may not have gone to pay this particular check; but as the overcheck was $5,800, and the discount was only $5,091.38, some part of the overcheck certainly was paid from other sources. We cannot undertake to say that a part of the proceeds has been satisfactorily traced to the defendant bank.

Decree according to this opinion.